Tyger & Karl Complete Water Systems Co., Inc.
*v.* Commonwealth.

Argued November 3, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS.

*Harry J. Rubin,* with him *Krekstein and Rubin,* for appellant.

*Edward T. Baker,* Deputy Attorney General, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, April 13, 1972:

Tyger and Karl Complete Water Systems Co., Inc., is a Pennsylvania corporation in the business of drilling water wells and installing pumping equipment for a variety of customers ranging from individual home owners and farmers to larger industrial and commercial enterprises. For the period from June 1, 1962 to March 31, 1965, the Bureau of Taxes for Education assessed against the appellant a use tax liability totaling $4,138.78 pursuant to the "Tax Act of 1963 for Education," Act of March 6, 1956, P. L. (1955) 1228, as amended, 72 P.S. §3403-1, et seq.[1]

Appellant's timely petition for refund was refused after hearing before the Sales Tax Board. A petition for review was then filed with the Board of Finance and Revenue which sustained the Board's ruling. This appeal followed.

The appeal was initially taken to the Court of Common Pleas of Dauphin County and was transferred to this Court pursuant to the Appellate Court Jurisdiction Act of July 31, 1970, P. L. 673 (Act No. 223), 17 P.S. §211.101, et seq. The parties then filed a stipulation of

---

[1] The original use taxes assessed by the Bureau following their 1965 audit of the corporation amounted to $3,062.86 in tax, $374.80 in interest, and $701.12 in penalties. The Bureau subsequently ordered the penalty stricken reducing the amount due to $3,437.66 which the corporation paid on January 17, 1966.

facts following the taking of two depositions which were incorporated in the stipulation as part of the record along with other exhibits relating to the Bureau's method of assessing the tax liability. The parties further agreed to waive a trial by jury pursuant to the Act of April 22, 1874, P. L. 109, 12 P.S. §688.

The essential dispute between the Commonwealth and appellant concerns the legal characterization which each places upon the appellant's business activities. The Commonwealth contends that the business of drilling water wells is properly subject to the use levy whereas the appellant argues that its operations come within the purview of the so-called "mining exemption" excluding certain mining, extracting, exploring and refining activities from the burden of such taxes.

The "Tax Act of 1963 for Education" generally imposes a tax as follows: "There is hereby imposed upon the use, on or after the effective date of this act, within this Commonwealth of tangible personal property purchased at retail on or after March 7, 1956 . . . a tax of [currently six (6) per cent but four (4) per cent until the Act of May 29, 1963, P. L. 49, and five (5) per cent until the Act of January 1, 1968, P. L. (1967) 918]. . . ." 72 P.S. §3403-201.

The definitional section of the Act contains a detailed description of the term, "use," which includes a variety of activities and services specifically subject to the tax. The section further contains a lengthy exclusionary proviso that reads in relevant part:

". . . And Provided further, That the term 'use' shall not include—

. . . .

"(c)  The use or consumption of tangible personal property including, but not limited to machinery and equipment and parts and foundations therefor, and supplies or the obtaining of the services described in sub-

clauses (2), (3) and (4) of this clause directly in any of the operations of—

"(i) The manufacture of personal property;

. . . . .

"The exclusions . . . shall not apply . . . to materials or supplies to be used or consumed in any construction, reconstruction, remodeling, repair or maintenance of real estate other than machinery, equipment or parts or foundations therefor, that may be affixed to such real estate. The exclusions . . . shall not apply to tangible personal property or services to be used or consumed in managerial sales or other nonoperational activities." 72 P.S. §3403-2(n). The term, "manufacture," is similarly defined in specific detail.

"(c) 'Manufacture.' The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and *shall include, but not be limited to*—

. . . . .

"(3) Refining, exploring, mining and quarrying for, or otherwise extracting from the earth or from waste or stock piles or from pits or banks, any natural resources, minerals and mineral aggregates, including blast furnace slag." 72 P.S. §3403-2(c). [Emphasis ours.]

Pursuant to these statutory directives, the Bureau of Taxes for Education has promulgated regulations as to what activities and services it deems to be subject to use tax. Two portions of such regulations are relevant because the parties take diametrically opposed positions as to which set of regulations applies to appellant's drilling operations. Further, the appellant asserts that the regulations fail to accurately reflect and to embody

the intent of the legislature in providing for the various manufacturing exclusions under the use tax provisions.

The Commonwealth contends that the water well drilling activities of the taxpayer involve ". . . materials or supplies to be used or consumed in any construction, reconstruction, remodeling, repair or maintenance of real estate . . .," 72 P.S. §3403-2(n)(4)(c), and therefore, by definition, constitute "construction." Construction contractors, as contemplated by the definition above, must pay use tax on their purchases of materials and supplies. The terms defining the taxable person and events are embodied in Regulation 224a in force during the taxing period here involved.

"(a)   Contractor Defined

"The term 'contractor' as used in this regulation means both general contractors and sub-contractors, and includes but is not limited to persons engaged in building, electrical work, plumbing, heating, painting, steel work, decorating, ventilating, paper hanging, sheet metal work, bridge or road construction, well digging, excavating, wrecking, house moving, landscaping, roofing, carpentry, brick or stone masonry, cement work, plastering, and tile and terrazzo work.

"Construction Contract Defined and Explained

"(1)   The term 'construction contract' means a contract, whether lump-sum, cost-plus, or time and material, under the terms of which a person agrees to perform construction activities. Construction activities include the furnishing of necessary materials, supplies, equipment or fixtures, and the use, installation, and/or incorporation of them in constructing, reconstructing, erecting, altering, improving, or repairing a road, bridge, building, other structure, or any real estate. Construction activities do not include the sale and installation of appliances, equipment, machinery, or other items of personal property not affixed by the seller to the real estate so as to become a permanent part thereof."

In further support of its position, the Commonwealth cites Regulation 228, the Mining Regulation, which reads as follows:

"(a) 'Mining' Defined:

"For the purposes of this regulation the term 'Mining' includes commercial mining (both deep and strip mining), quarrying, gas and oil drilling, and *any other commercial extraction of natural resources,* minerals or mineral aggregates from the earth; *it also includes exploring the earth for and refining of natural resources,* minerals and mineral aggregates for commercial purposes; and further includes the commercial activity of exploring, extracting and refining of natural resources, minerals and mineral aggregates, including blast furnace slag, from waste or stock piles, pits, or banks.*

"Therefore, 'mining' includes the exploring, extracting and refining for commercial purposes of coal, cinders, crushed and graded rock, gravel, sand, oil, gas, blast furnace slag, tar, slate, ore and all minerals and similar natural resources and mineral aggregates.

" 'Exploring' means the examination and investigation of the earth, waste or stock piles, pits or banks by drilling, boring, sinking shafts or driving tunnels.

" 'Extracting' means the removing of natural resources, minerals, and mineral aggregates from the earth, waste and stock piles, pits, or banks, and also includes the separation of the dirt, waste and refuse in which they were found.

" 'Refining' means the cleaning, grading, cracking, crushing, and similar processing of natural resources, minerals, and mineral aggregates after their extraction from the earth, waste or stock piles, pits or banks.

---

\* Water well drilling is not included in this regulation. Water well drillers are not entitled to the mining exemption. They are considered to be contractors and must pay tax on their purchases in conformity with Regulation 224. [Footnote in original.]

"(b)    The Mining Exemption Generally:

"An exemption is generally applicable to the sale at retail of tangible personal property to be used or consumed directly in mining. The use of tangible personal property directly in mining is also generally not taxable. Certain exceptions to these general principles are set out in Sections (d) to (i) of this regulation. The exemptions herein provided for shall be referred to as the 'Mining Exemption'. These exemptions are not applicable to materials, machinery, equipment, parts and supplies predominantly employed other than directly in mining operations. *Sale or use of property purchased to be used predominantly in mining operations is exempt even though such property might be used other than directly in mining.*" [Emphasis ours.]

We must decide whether the Commonwealth had legal justification in the statutory language to have promulgated Regulation 228 excluding water well drilling while including within the exclusion other types of extractive operations and well drilling for other liquid and gaseous resources. Our decision must hinge on a determination of whether appellant's business activities can be characterized as "mining" or as "construction" within the contemplation of the "Tax Act of 1963 for Education," 72 P.S. §3403-1, et seq.

By stipulation, the parties have agreed to the following description of the appellant's activities:

"12.   Defendant's initial activities, following its retention by a customer, involve an inspection of the site to determine the location and kinds of rock strata, the configuration of the property, the distance from sewage disposal facilities and drainage needs. It then engages in test drillings to locate an appropriate water seam over which a functioning water well can be drilled and put into operation.

"13. After drilling a shaft in the determined location, defendant drives a casing down this shaft. If water has been located in an area of consolidated rock, the casing is embedded in a rock base. If water has been located in an area of sand and gravel, the casing is not embedded in a rock base. The casing serves both as the outside wall of the well and support for the pumping equipment as well as protection for the upward flow of water against acid drainage from the surrounding soil. Defendant then inserts chlorine through the shaft to destroy any bacteria produced by the drilling operation and tests the water for iron and mineral content. Following this, defendant completes the operation by placing a pump either in or on top of the shaft (depending on which of two types of pumps is selected), inserts the necessary seals, wiring and pipelines (to the point of use) and places the necessary control devices, pressure tanks and outlets on the customer's premises. No housing or structure for such equipment is erected by the defendant. Defendant then extracts the first flow of water through the system.

"14. The water supply developed by defendant becomes the property of defendant's customers. Generally, the water produced by defendant's activities is consumed and used in the state produced and no further activities are carried on in relation to the water."

We adopt the facts stipulated by the parties as our findings of facts and make such additional findings as we shall indicate below.

There is no case law in Pennsylvania which directly discusses the narrow issue here involved and the few cases cited by the parties in their briefs are of only general usefulness. We must instead rely upon broad principles of statutory construction, the language of the relevant statute, and the evidence in the record before us as indicating precisely what the appellant's operations

entail and where such operations fall into the definitions of the statute.

As to the statutory construction of the use tax provisions and the enumerated exclusions, we must follow the proposition that the legislature in providing for "exclusions" from taxation rather than "exemptions," intended these exclusions to be strictly construed against the Commonwealth. *Commonwealth v. Sitkin's Junk Co., Appellant,* 412 Pa. 132, 141-2, 194 A. 2d 199, 204 (1963). As to a taxpayer attempting to establish his right to an exclusion specified in the statute, the burden of so proving is not as heavy as if he were trying to establish an exempt status. *Commonwealth v. Carlow-Patton Corp.,* 86 Dauph. 348 (1966).

Keeping these two principles before us, we have examined the evidence and arguments presented and concluded that the appellant's activities do come within the mining exclusion. We further conclude that the language in the footnote to Regulation 228 excluding water well drilling operations is invalid as contrary to the legislative intent as embodied in the mining exclusion.[2]

We base our ruling both on a determination that (1) the activities undertaken by the appellant in drilling a

---

[2] Old Regulation 228 was superseded on January 1, 1969, by a newer version which under the "Definitions" heading reads: "Mining includes commercial mining (both deep and strip mining), quarrying, gas and oil drilling, and any other commercial extraction of natural resources, minerals or mineral aggregates from the earth. It also includes the exploring, extracting and refining for commercial purposes of coal, cinders, clay, crushed and graded rock, gravel, sand, oil, gas blast furnace slag, tar, slate, ore and all minerals and similar natural resources and mineral aggregates. However, water well drillers are not entitled to the mining exemption. They are considered to be contractors and must pay tax on their purchases in conformity with Regulation 150, Construction Contractor." A fortiori, such new exclusionary language is now invalid.

water well and installing pumping equipment, even though such equipment becomes the tangible personal property of the customer for whom the well is drilled, constitutes an activity sufficiently similar to refining, exploring, mining or quarrying to be included in the phrase "or otherwise extracting from the earth," and (2) the activities do not constitute "construction, reconstruction, remodeling, repair or maintenance of real estate" as these terms are generally used, absent specialized definitions in the statute.

As to our first determination that appellant's activities are an exploring or extracting process to retrieve a natural resource from the earth's subsurface, we find support for our conclusion in *Commonwealth v. Carlow-Patton Corp., supra,* where the mining exclusion was deemed to include the extraction of blast furnace slag from waste pits. It was there concluded without extended discussion that the slag extracting operation came clearly within the statutory language and that the central issue was the nature of the product extracted. In ruling on the question, the court said: "Words in a statute must, where the statute does not define them, be given their 'common and approved usage,' and if they are technical and have acquired a peculiar and appropriate meaning, then they 'shall be construed according to such peculiar and appropriate meaning.' Statutory Construction Act, Act of May 28, 1937, P. L. 1019, §33 (46 P.S. §533)." 86 Dauph. at 351.

Here, the substance extracted is water which the Commonwealth concedes in its brief is a natural resource. Further, the definition of underground water as a natural resource in common usage and parlance is reenforced by the following statutory language found in the "Water Well Drillers License Act," Act of May 29, 1956, P. L. (1955) 1840, 32 P.S. §645.1:

"§645.1 State policy.

"Whereas, underground water in the Commonwealth of Pennsylvania is a renewable natural resource with a great potential for further development; and whereas, it is imperative that this resource be developed, in an orderly and reasonable manner, without waste, in order to assure sufficient supplies for continued population growth and industrial development of the Commonwealth.

"Therefore, it is the policy of the General Assembly of the Commonwealth of Pennsylvania to take such steps as shall be necessary to encourage the orderly development of this resource and to this end, it is imperative that persons engaged in water well drilling and the Commonwealth closely cooperate to procure detailed information on the ground water resources for the use of State officials and the general public in the direction of ground water development." Underground water being a natural resource falls squarely within the language of the mining exclusion.

The nature of appellant's operations in getting to this natural resource involves no process that could be fairly characterized as "construction." Appellant repeatedly asserts that no structure or other improvement to the surrounding real estate results but only that such pumping equipment as is necessary to maintain the desired flow of water is installed. Such installation is incidental to the primary exploring and extracting process. We are supported in our characterization of the subject drilling activities by the distinctions drawn between drilling contracts and construction contracts in *Commonwealth v. Lohmann-Johnson Oil Co., Inc., Appellant,* 436 Pa. 84, 258 A. 2d 524 (1969). While that case dealt with provisions of the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §34206, and with oil and gas drilling, its language bears repeating here.

"Absent any specific statutory guide in the Corporate Net Income Tax Act, the Commonwealth argues that common usage must govern, citing Section 33 of the Statutory Construction Act, 46 P.S. §533. In this light it refers to this Court's decision in Hoffman v. Kline, 300 Pa. 485, 150 Atl. 889 (1930), for the meaning of 'construction' and supports this position by reference to standard dictionary and encyclopedia references to the word. In every case the word is used in a way which tends to exclude the drilling of a well. The court below also adopted this approach. Appellant has presented no counter-authority.

"We see little to be gained by repeating all of these references. While it is certainly possible to equate a contract calling for drilling activities with a 'construction contract,' it is, nevertheless, common usage to refer to the former as a 'drilling contract;' and it is perfectly reasonable to assume that were the special gross receipts allocation provision meant to apply to both, the legislature would have said 'In the case of construction or drilling contracts.' Not having done so, it can only be presumed to have limited application of this provision to what are customarily called 'construction contracts.' " 436 Pa. at 87-88, 258 A. 2d at 525.

We cannot find any substantial difference between drilling for oil or gas and for water. The depositions of the two expert witnesses amply demonstrate the similarities in all such drilling operations and we can find no merit in the Commonwealth's classification of water well drilling as somehow inherently different from other sorts of drilling. Absent compelling proof of such a difference introduced by the Commonwealth, we feel that appellant has ably sustained its burden in showing that its drilling operations qualify for exclusion from use taxation as the exploration for and extraction of a natural resource.

We therefore make the following additional

## FINDINGS OF FACT

1. The drilling of a water well shaft as described in the stipulation of facts and supporting evidence constitutes the examination and investigation of the earth by drilling, boring, or the sinking of shafts so as to be characterized as exploring.

2. The sinking of well casing to obtain water from the earth's subsurface constitutes the removing of a natural resource from the earth so as to be characterized as extracting.

3. By general usage and statutory direction, underground water constitutes a natural resource.

## CONCLUSIONS OF LAW

1. The predominant activity carried on by Tyger and Karl Complete Water Systems Co., Inc., constitutes the exploration for and extraction of a natural resource from the earth.

2. The necessary installation of pumping equipment at the surface of a water well drilled by the corporation is incidental to its predominant activity and does not alter the primary characterization of such activity.

3. The predominant activity of the corporation in drilling water wells and sinking casings legally constitutes exploration for and extraction of a natural resource from the earth within the purview of the so-called mining exclusion from use tax liability imposed by the "Tax Act of 1963 for Education," 72 P.S. §3403-2(c)(3).

4. The predominant activity of the corporation in drilling water wells, sinking casings, and installing surface pumping equipment, even though such equipment

becomes the personal property of the customer for whom the well was drilled, does not legally constitute a permanent addition to the subject real estate so as to be characterized as construction.

5. Regulation 224a, "Contractors Regulation," is not applicable to the corporation's activity for the tax period in question.

6. Regulation 228, "Mining Regulation," is applicable to the corporation's activity for the tax period in question.

7. The exclusion from Regulation 228 of water well drilling is invalid as contrary to the statutory provisions of the "Tax Act of 1963 for Education," 72 P.S. §3403-1, et seq.

8. The Board of Finance and Revenue erred in sustaining the use tax assessment in question.

9. The appeal of Tyger and Karl Complete Water Systems Co., Inc., should be sustained.

## Order

Now, April 13, 1972, the appeal of Tyger and Karl Complete Water Systems Co., Inc., from the decision of the Board of Finance and Revenue in refusing its petition for review and sustaining the decision of the Sales Tax Board imposing use tax on the purchase of supplies and materials during the period June 1, 1962 to March 31, 1965, in the amount of $4,138.78 and later reduced to $3,437.66, is sustained and the assessment stricken. Judgment in favor of Tyger and Karl Complete Water Systems Co., Inc., is hereby directed to be entered unless exceptions hereto are filed within twenty (20) days of the filing of this order, as provided by law.